**PORZIO, BROMBERG & NEWMAN, P.C.**
156 West 56th Street
Suite 803
New York, NY 10019-3800
(212) 265-6888
(212) 957-3983 Facsimile
Brett S. Moore, Esq.
Warren J. Martin Jr., Esq. (*pro hac vice* pending)
Gary M. Fellner, Esq.

*Proposed Counsel to Debtors*
**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: | Chapter: 11 |
| Woodside Management, Inc., *et al.*,[1] | (Joint Administration Pending) |
| Debtors. | Case No.: 17-13150 (MKV) |
| WOODSIDE MANAGEMENT INC., 28TH STREET MANAGEMENT INC., TUNNEL TAXI MANAGEMENT LLC, DOWNTOWN TAXI MANAGEMENT LLC, | Adv. No. _____ |
| PLAINTIFFS, | |
| -AGAINST- | |
| MAMED DZHANIYEV, VLADIMIR BASIN, BORIS BASIN, MIKHAIL KATS, VERONIKA KATS, MAKISM KATS, GALINA SHEGELMAN, VAS TAXI INC., YELLOW CITY LLC, YELLOW DIAMOND TAXI LLC, YELLOW ROCKET TAXI LLC, YELLOW CARRIAGE TAXI LLC, YELLOW DEVIL TAXI LLC, YELLOW CRAVAN TAXI LLC, DANIYAL TAXI INC., DOCHENKA TAXI INC., TWINKLE CAB CORP., KING MARIO TAXI INC., JUNCO TAXI INC., CABBO SERVICE | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Woodside Management, Inc. (0101), Tunnel Taxi Management, LLC (4108), Downtown Taxi Management, LLC (4301) and 28th Street Management, Inc. (9791).

CORP., AL-ALL CAB CORP., LIBNOTH
CAP CORP., PHILIP TAXI INC., KING ED
TAXI INC., NY KFAR TAXI CORP., OAK
TAXI INC., FLAMINGO TAXI INC.,
GORYANKA TAXI, GORES TAXI INC.,
DAMA TAXI INC., DANUSHKA TAXI
INC., VOBLA TAXI INC., BRTISHKA TAXI
INC., KORMILITSA TAXI INC., KROSHKA
TAXI INC., PERSIK TAXI INC., YAGODKA
TAXI INC., MURZIK TAXI INC.,
MALINKA TAXI INC., STARUSHKA TAXI
INC., CORCOVADO CAB CORP., KAISU
TAXI INC., NUSYA TAXI INC., GALUSHA
TAXI INC., MARUSYA TAXI INC.,
YANUSH TAXI INC., MALYSH TAXI INC.,
SEMYA TAXI INC., DRUZHBA TAXI INC.,
EMO CAB CORP., PESNYA CAB CORP.,
ETILEE CAB CORP., ZODIAC TAXI INC.,
MIRA EXPRESS TAXI INC., KISKA TAXI
INC., ATOLL TAXI INC., GORKY TAXI
INC., MAKS AND DANNY CAB CORP.,
VOZDUX TAXI INC., PACE CAB CORP.,
ESQ TAXI LLC, PROTÉGÉ TAXI LLC,
SHOOTING STAR TAXI LLC, PIZZA TAXI
LLC, NY PISCES TAXI CORP., NY
COOKIE TAXI CORP., KATOM TAXI INC.,
DAVID TAXI CORP., DUSHA TAXI LLC,
OPTIMIST TAXI LLC, SPASIBO TAXI LLC,
EPIPHANY TAXI LLC, FADE TAXI LLC,
TRANQUIL TAXI LLC, KEN SERVICE
CORP., DAG TAXI INC., MERRY CAB
CORP., HEBY TAXI INC., NY SABRA
TAXI CORP., FORWARD TAXI INC., NY
UBU TAXI CORP., NY YNU TAXI CORP.,
NY ABAR TAXI CORP., KING PIERRE
TAXI INC., ASTRA TAXI INC., CRUISER
TAXI CORP., B & D RIDE HACKING
CORP., BIMER TAXI INC., VOIN TAXI
INC., SABOR TAXI INC., ERMITAGE
TAXI, LLC, POUND TAXI, LLC, BOSS
TAXI LLC, TAGANKA TAXI LLC,
SHEKEL TAXI LLC, RIVIERA TAXI, LLC,
BOLIVAR TAXI, LLC, MARBORO
HACKING CORP., MOTZKIN TAXI INC.,
BASNYA TAXI INC., BAZAR TAXI INC.,
PRAGA TAXI INC., TORPREDO TAXI

INC., LACOSTE TAXI INC., HUBLOT TAXI
INC., PRADA TAXI INC., STUDENT TAXI
INC., PIGUET TAXI INC., PUMO TAXI
INC., PORSCHE TAXI INC., ARAGVI TAXI
INC., ARBAT TAXI INC., BREITLING
TAXI INC., VOVCHIK TAXI, INC.,
BULIBASS TAXI INC., AVAR TAXI CORP.,
CRUISER TAXI CORP., MAMED TAX
INC., AND CREATIVE MOBILE
TECHNOLOGIES LLC,

                    DEFENDANTS.

## ADVERSARY COMPLAINT

Woodside Management Inc. ("Woodside"), 28th Street Management Inc. ("28th Street"),

Tunnel Taxi Management, LLC ("Tunnel") and Downtown Taxi Management LLC

("Downtown") (collectively, the "Debtors")(joint administration pending), by and through their

attorneys, Porzio, Bromberg & Newman, P.C., hereby allege for their complaint and claim for

relief as follows:

## NATURE OF THE ACTION

1.      This adversary proceeding is filed to obtain immediate and preliminary injunctive

relief under Section 105 to preserve property of the estate, the income generated from it, and to

turn over that property under Section 542 and the common law principles of conversion,

constructive trust, and replevin.   Defendants, which are merely owners of taxi *medallions*, took

the Debtor's taxi *vehicles-assets and the underlying taxi businesses* to enrich themselves at the

expense of the Debtors.   The Debtors have been in the business of managing and operating taxi

cab fleets for several years.

2.      The Debtors need equitable relief to, among other things, retrieve, secure and

preserve 188 taxi cab vehicles that the Debtors, at all relevant times, beneficially owned,

operated, and possessed through August 31, 2017.   On or about that date,   the Medallion

Defendants (as specifically identified below) unilaterally converted the vehicles for their own use. A list of the vehicles that are the subject of this proceeding is attached hereto as **Exhibit A** (collectively referred to as the "Vehicles"). The Debtors seek to have these Vehicles turned over, back to their rightful possession in accordance with Sections 105 and 542, and the common law principles stated below.

3. The Debtors managed and operated all of the Vehicles as part of their taxi cab fleet business, utilizing the New York City taxi cab medallions they had leased from the Medallion Defendants. The Medallion Owner Defendants had no hand in the operation of the taxi business.

4. At all relevant times, Debtors, as operators of the cabs and their beneficial owner, purchased and incurred all costs and expenses associated with the Vehicles. They covered all necessary insurance obligations, and collected all revenues from the use of the Vehicles by taxi drivers.

5. The Debtors paid the Medallion Defendants a monthly fee for use of the medallions as verbally agreed among the parties. The Medallion Defendants were entitled to nothing more; and at no time did they have any possessory or beneficial interest in the Vehicles.

6. While a subset of of the Vehicles at issue were initially titled in the names of certain Medallion Defendants for convenience purposes, that bare legal title was at all times held in trust for the sole benefit of the Debtors. The Debtors are, and have always been, the beneficial owners of all of the Vehicles.

7. Pursuant to the historical agreements and longstanding practices in the industry, medallion owning entities, like the Medallion Defendants, were at all times limited to the business of: (i) purchasing medallions, (ii) incurring debt in favor of the banks or other

financiers who funded the purchases of those medallions, and (iii) leasing or loaning those medallions to operating or managing entities like the Debtors, for a monthly fee, which fee was generally fixed in an amount equal to the debt service on the medallion owning entities' bank debt.  In terms of the mechanics of the cash flow, the monthly fee was typically paid directly to the banks or finance companies by the operating/managing companies like the Debtors, even though the Debtors had no privity with the banks or other financiers and were not responsible for the medallion debt.

8.    Conversely, the medallion owning entities, like the Medallion Defendants, never had any role in the operation of the business, whether that meant purchasing taxi cab vehicles, insuring them, "hacking" them up, maintaining and servicing them, running drivers, paying taxes, or engaging in any other business attendant to the actual use or operation of taxi cab vehicles.  Indeed, in most cases, the medallion owning entities, like the Medallion Defendants, held no bank accounts and had no employees:  their business was limited to holding, financing and leasing the medallions.

9.    The Debtors and Medallion Defendants here operated at all times pertinent hereto in accordance with the  industry practice as described in paragraphs 7-8, above.

10.    During the last three years, the taxi cab business has experienced a sustained downturn due to the emergence of ride sharing competitors and technology (*i.e.*, such as Uber). As a result, the revenue able to be earned on New York City taxi cab medallions, and concomitantly, the value of New York City taxi cab medallions has continued to plummet.

11.    Because of the sustained downturn in the industry, the Debtors no longer had the revenues available to pay sufficient monthly fees to the Medallion Defendants to enable the Medallion Defendants to keep current with their debt service obligations.

12.     As a result, during the Summer of 2017, the Medallion Defendants began implementing a plan to convert the Vehicles, and indeed the Debtors' entire business, for their own use.   The Medallion Defendants' purpose was to hijack not only the Vehicles, but to illegally divert the Debtors' entire revenue streams that were being generated from the Vehicles' use and operation.  The Medallion Defendants executed their plan on or about August 31, 2017, converted the Vehicles from the Debtors, and are now using and operating the Vehicles at issue here to the severe detriment of the Debtors, whose entire revenue stream was abruptly terminated on September 1, 2017.

13.     The Debtors therefore seek, among other things, to retrieve and have turned over to their rightful possession the Vehicles that the Medallion Defendants have wrongfully converted as authorized by Section 542; to recover the revenues to which they have been deprived because of the Medallion Defendants' wrongful conduct and contractual breaches; to enjoin, pursuant to Section 105 of the Bankruptcy Code, the Medallion Defendants from taking any actions that could damage or alter the Vehicles in any way; to direct that certain vehicles that are no longer operating as taxi cabs - as the vehicles' medallions have been repossessed by Banco Popular – be removed from the Medallion Defendants' (or their agents') possession, and transported to a secure protected facility; to enjoin the Medallion Defendants from directly receiving any further revenues from their use of the Vehicles, and instead, requiring all such revenues to be held and transferred by Defendants, including Creative Mobile Technologies LLC, in an independent escrow account, over which only a designated escrow agent may have access until this matter has been resolved; and to compel Defendants to provide the Debtors with full access to any and all computer programs, systems, and technology that permits them to

review and keep apprised of the revenues being generated from the use of the Vehicles, and any associated costs.

## THE PARTIES

14.     Debtors Woodside, 28th Street, Tunnel and Downtown manage and operate taxi cab fleets in New York City.  Woodside and 28th Street are New York corporations, and Tunnel and Downtown are New York limited liability companies.

15.     The vast majority of the defendant entities named herein are owners of New York City taxi cab medallions, which they leased out, for a fee, to the Debtors.  These medallion owner entities include the Defendant entities as set forth in the above caption (excluding Creative Mobile Technologies LLC), which are collectively referred to herein as "Medallion Defendants." Upon information and belief, the Medallion Defendants are all New York corporations and/or limited liability companies.

16.     Defendants Mamed Dzhaniyev, Vladimir Basin, Boris Basin, Mikhail Kats, Veronika Kats, Makism Kats, and Galina Shegelman ("Individual Defendants") are the individuals who are the owners and/or officers of the Medallion Defendants.  They are  natural persons who, upon information and belief, are citizens of the State of New York.

17.     Defendant Creative Mobile Technologies LLC ("CMT") is a New York limited liability company that provides various technology solutions to the taxi cab industry, including credit and debit card clearing and processing, dispatch solutions, fleet management infrastructure, logistics and data management, and portals for driver and payment information.

**JURISDICTION AND VENUE**

18.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2).

19.    Venue of this proceeding and this complaint is proper in this district pursuant to Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

20.    This complaint is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. §1452(a).

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**Background**

21.    For more than ten years, the Debtors have managed and operated taxi cab fleets in New York City.

22.    A critical component of the Debtors' business is leasing the use of New York City taxi cab medallions, which get "hacked up" among the Debtors' Vehicles – one medallion to one vehicle.  A tangible medallion or tin is affixed to the hood of a taxi cab vehicle, at which point, the vehicles can be placed in service (or "on the road") as taxis for the purpose of transporting customers in the New York City area.

23.    Evgeny Freidman ("Freidman") is a shareholder and/or managing member of the Debtors, and has at all times controlled and supervised the Debtors' operations.

24.    For years, defendants Mamed, Vladimir, Boris, and Mikhail served as employees of some or all of the Debtors, which were under Freidman's control, while the Debtors were engaged in managing medallions owned by different Freidman owned entities. Over time, as business prospered, Mamed, Vladimir, Boris, and Mikhail, along with their wives and children, including Makism, Veronika, and Galina, used their generous earnings

from Freidman to purchase medallions, often with the aid of financing; and in some instances, Freidman, through the Debtors, compensated Mamed, Vladimir, Boris and Mikhail by transferring medallions to them (this was in addition to Freidman, through the Debtors, paying these employees salaries, bonuses, and other benefits including health care coverage). The individual defendants formed several entities, referred to herein as the Medallion Defendants, for the sole purpose of holding, and leasing out, the medallions.

25.    The Debtors purchased hundreds of vehicles over time, and in many instances, operated the vehicles as New York City taxi cabs by leasing medallions from the Medallion Defendants. Without a medallion, i.e. license from the Taxi and Limousine Commission, the vehicle cannot operate as a taxi cab.

26.    At all relevant times, the Debtors were, and are, the beneficial owners of the Vehicles they purchased, including the Vehicles identified in Exhibit A herein. Many of the Vehicles are currently operating with medallions owned by the Medallion Defendants.

27.    The 188 Vehicles addressed in this Complaint fall into various categories. Approximately 97 of the Vehicles were previously registered and titled in the name of the Medallion Defendants. This was done for purposes of convenience and is consistent with the course of dealing in the taxi cab industry and among the parties.

28.    While these Vehicles were nominally owned by the Medallion Defendants for a period of time, the Debtors, at all relevant times and in some cases for the benefit of others, (i) purchased the vehicles, (ii) insured them, (iii) repaired them, and (iv) maintained them.

29.    The Debtors incurred the expenses of acquiring and maintaining the Vehicles because as operators of New York City taxi cab fleets, the vehicles are a key business asset and essential for the generation of revenue. Anything that causes a vehicle to be taken out of

service (*i.e.*, off of the road), whether it be due to property damage, insurance issues, or something else, equates to a loss of revenue for the Debtors.

30.     At no time have the Medallion Defendants made any financial contributions towards the Vehicles for acquisition, maintenance, repair, or insurance.

31.     It was understood and at all times agreed to, as among the Debtors and Medallion Defendants, that in the event legal title for any vehicles was issued to the Medallion Defendants, it would be done so in trust, for the benefit of the Debtors who paid for and managed the vehicles and incurred all vehicle associated expenses.

32.     The Medallion Defendants are nothing more than holding companies that own the taxicab medallions.  They do not have, nor have they ever had, a possessory right or interest in the Vehicles.  The Medallion Defendants did not operate any of the Vehicles at issue, nor did they ever generate any direct revenue therefrom.

33.     At all times pertinent hereto, and continuing to date, each and every original certificate of title for the Vehicles listed on Exhibit A is, and has been, <u>in the physical possession of the Debtors,</u> or an agent or representative of the Debtors, and not in the possession of the Medallion Defendants.

34.     As described above, the Debtors, and/or their agents, made direct payment of the Medallion Defendants' monthly debt service obligations to the Medallion Defendants' medallion lenders.

35.     In or about mid-2014, defendants Mikhail, Vladimir and Boris, who owned several of their own medallion holding companies, chose to separate the Debtors' employment. Notwithstanding this, the Debtors' leasing of the medallions and operation of the business

(including the payment of debt service for the Mikhail, Vladimir and Boris entities) continued unabated.

36.     The tide began to turn, however, with the burgeoning success of so called "ride sharing" companies such as Uber, Via, and others.  The ubiquity and success of these entities substantially reduced, and continues to substantially reduce, the revenue and profits of taxi cab fleet managers such as the Debtors; and, has severely de-valued the taxi medallions, which are now valued at a small fraction of their 2014 values.

37.     Despite the Debtors' shrinking revenue, they continued to support the Medallion Defendants, and the Individual Defendants.  For instance, in or about February 2016, a lender repossessed several medallions that were owned by Vladimir's entities.  Freidman, through the Debtors, paid off the outstanding debt as a management fee advance, thereby allowing Vladimir to take back possession of his entities' medallions.

38.     The severe decline in revenue persisted, however, requiring the Debtors to make some difficult, yet necessary, business decisions.  In or about the summer of 2017, Freidman informed his employees that compensation would be reduced, and certain benefits such as full health coverage and cell phone payments would end.  The Debtors also had no choice but to stop making debt service payments for the Medallion Defendants - - payments which the Debtors were never and are not now directly obligated to make, as there exists no privity between the medallion financiers and the Debtors.

39.     As the industry deteriorated further, the Debtors' financial stress was magnified.  As of January 1, 2017, the Debtors had consolidated their operations and retained Taxi Club Management, USA ("Taxi Club USA"), a related entity, to serve as the Debtors' agent for managing the business operations and cash flows of the Debtors.

3799419

11

40.     Specifically, when a customer took a ride in one of the Vehicles at issue here, and paid with a credit card, those credit card moneys were received and cleared by CMT, and directed to Taxi Club USA, as the Debtors' agent, that is, up until the events of August 31, 2017 and September 1, 2017, described immediately below.

## DEFENDANTS STEAL THE DEBTORS' VEHICLES AND REVENUE

41.     In the Summer of 2017, with financial stresses magnifying all around, the individual defendants hatched a  plan to steal the Debtors' business and revenue.

42.     Upon information and belief, between August 18, 2017 and August 30, 2017, the Medallion Defendants contacted the New York State Division of Motor Vehicles, and falsely represented that the certificates of title to the Vehicles, which were at all times in the possession of the Debtors and which the Medallion Defendants knew were at all times in the possession of the Debtors, had been "lost."  Based upon those false representations, the Medallion Defendants obtained "duplicate titles" from the DMV, examples of which are annexed hereto as **Exhibit B**, each of which contains the following legend: "This is a duplicate certification and may be subject to the rights of a person under the original certificate."

43.     Second, on or about August 31, 2017, upon information and belief, the Medallion Defendants presented these false title documents to CMT, advising CMT that (i) they were the owners of both the medallions and the Vehicles; (ii) they were switching from the Debtors' operation and management of the Vehicle fleets to "self-management," and (iii) that CMT was thereupon authorized to "flip" the proverbial switch so that as of September 1, 2017, all revenues from the Debtors' businesses would instead be delivered to the Medallion Defendants' bank accounts, rather than to the accounts of the Debtors' agent, Taxi Club USA.

44.    CMT followed the direction of the Medallion Defendants and therefore, effective September 1, 2017, diverted all of the Debtors' business revenues to the Medallion Defendants.  This act deprived the Debtors not only of their business revenues, but also of access to the CMT portal, which allows monitoring and tracking of all revenue receipts and, upon information and belief, certain expenses in connection with the operation of the Vehicles.

45.    Third, on August 31, 2017, and upon information and belief, in the dead of night, the Medallion Defendants appeared at the Debtors' premises and unlawfully removed and/or took control over the Vehicles.   The Debtors do not know where many of these vehicles are currently.

46.    Fourth, on August 31, 2017, the Medallion Defendants filed, but did not serve on the Debtors until September 5, 2017, a complaint and order to show cause for a Temporary Restraining Order ("TRO") in the Supreme Court of New York, Kings County under Index No. 2446/17.  A copy of the Medallion Defendants' unintelligible pleadings in support of the Order to Show cause and TRO are annexed hereto as **Exhibit C**.

47.    Notwithstanding the fact that the Medallion Defendants' Kings County pleadings and motion papers are truly unintelligible, the Medallion Defendants successfully obtained a TRO against the Debtors, without notice, and on false pretenses.  That TRO prevents the Debtors and others from taking or interfering with "taxi cab vehicles associated with" the Medallion Defendants' medallions.

48.    Importantly, in their annexed Order to Show Cause papers, the Medallion Defendants falsely represented to the state court that they are the owners of the Vehicles identified in Exhibit A herein, and that Freidman, individually and on behalf of the Debtors, was making threats to convert the Vehicles from the Medallion Defendants' possession, and/or

to damage the Vehicles.  Strikingly, when the TRO application was filed (and granted the same day without notice), the <u>Medallion Defendants themselves</u> had already converted and taken possession of the majority of the Vehicles.

49.     The imminent "threats" and harm that were alleged to support the TRO were nothing more than vague, hearsay accounts of events that occurred in 2011 between Freidman and individuals who were not parties to the lawsuit, and which were completely unrelated to the Vehicles at issue.

50.     Despite the Medallion Defendants' complete failure to meet the standard required for a TRO, it was granted, and continues to persist, for reasons that are unexplainable.[2]  The hearing to consider whether the TRO should ripen into a preliminary injunction is currently scheduled for November 6, 2017, in Kings County.

51.     Contemporaneous with filing their state court TRO application, the Medallion Defendants (and their agents) continued their systematic conversion of the Debtors' Vehicles (and Taxi Club USA's revenues) from the Debtors' to themselves.

52.     The Medallion Defendants have deliberately deprived the Debtors of their beneficial ownership and possessory interest in the Vehicles for the purpose of using these Vehicles for their own enrichment at the Debtors' expense.

53.     By depriving the Debtors of their rights to possess, use, and operate the Vehicles, the Medallion Defendants have thwarted the Debtors' ability to continue operating and generating revenue; and, have usurped the Debtors' businesses and are generating revenue that rightfully belongs to the Debtors.

---

[2] The Medallion Defendants are represented in the Kings County action by Frank Seddio, Esq., https://www.villagevoice.com/2017/08/10/insurgent-campaigns-aim-to-shake-up-brooklyn-judicial-races/ ; http://nypost.com/2017/09/18/state-senate-candidate-dem-leaders-have-stolen-nomination/ ; http://www.nydailynews.com/new-york/brooklyn/borough-democrats-chief-involved-illegal-fund-raiser-article-1.3392116

54.     As it currently stands, upon information and belief, the Medallion Defendants are currently operating the majority of the stolen Vehicles identified in Exhibit A as taxi cabs, for their sole financial benefit.

55.     Upon information and belief, 54 of the Vehicles are not operating because they have been stripped of their medallions, due to a repossession by lender Banco Popular. Nonetheless, the Medallion Defendants continue to hold these vehicles in an undisclosed location, despite having no possessory rights to them. These 54 Vehicles are identified in Exhibit A herein.

56.     The Debtors are, and have always been, the beneficial owners of the Vehicles that are at issue in this proceeding.  The Medallion Defendants were only constructive trustees of the Vehicles for which they were initially issued legal title; and for several of the Vehicles, title was never issued to the Medallion Defendants, meaning they never held either legal or beneficial title.  Yet, they have diverted these Vehicles as well.

## COUNT I
### (Injunctive Relief Pursuant to Section 105)

57.     Debtors repeat each and every allegation aforementioned as if set forth at length herein.

58.     Section 105(a) of the Bankruptcy Code authorizes and empowers the Bankruptcy Court to issue any orders that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the Debtors' bankruptcy cases, aid in the preservation of the assets of the Debtors' estates, and aid in the promulgation and confirmation of a chapter 11 plan that maximizes value for all stakeholders.

59.    Pursuant to sections 362 and 105(a) of the Bankruptcy Code, the Bankruptcy Court may enjoin parties where necessary to prevent an adverse impact on the Debtors' estates or to assure the orderly administration of the Debtors' chapter 11 estates and proceedings.

60.    The issuance of an injunction is appropriate to prohibit Defendants from using, damaging, and/or wasting property of the estate.

61.    The likelihood of irreparable harm to the Debtors in the absence of injunctive relief far outweighs any harm that Defendants could plausibly suffer due to an injunction.  The injunctive relief requested herein will serve the public interest by promoting compliance with the congressional purposes underlying the automatic stay and encouraging a successful outcome in these cases.

62.    An injunction is equitable and appropriate to permit the Debtors to preserve and recover their assets, including the revenues to which they have been deprived because of the Medallion Defendants' wrongful conduct and contractual breaches.

63.    An injunction is also equitable and appropriate to enjoin the Medallion Defendants from taking any actions that could damage or alter the Vehicles in any way.  This should include: (a)  enjoining the Defendants from engaging in any conduct that could damage or alter any portion of the Vehicles identified in Exhibit A herein that, upon information and belief, have medallions associated with them and are currently operating as taxi cab vehicles; and (b) requiring that the 54 Vehicles identified in Exhibit A that are no longer operating as taxi cabs - as the vehicles' medallions have been repossessed by Banco Popular – be removed from the Medallion Defendants' (or their agents') possession, and transported to a secure, protected and reputable facility such as that used by Deborah Piazza, Esq., as Chapter 7 Trustee in the *In re Red Bull* matter, Case No. 16-13153 (MKV), which was  MYC Corp, www.myccorp.com in

order to safely stored and protect these vehicles until such time as this matter has been resolved.

64.     An injunction is also equitable and appropriate to order that all revenues generated from the stolen Vehicles be transmitted to, and held, in an independent escrow account, over which only a designated escrow agent may have access until this matter has been resolved.

65.     An injunction is also equitable and appropriate to compel Defendants to provide the Debtors with full access to any and all computer programs, systems, and technology that permits them to review and keep apprised of the revenues being generated from the use of the Vehicles, and any associated costs.

## COUNT II
### (Turnover of Vehicles Pursuant to Section 542)

66.     Debtors repeat each and every allegation aforementioned as if set forth at length herein.

67.     Defendants have orchestrated a plan to take for themselves the Vehicles so that they can operate the taxi business to the Debtor's detriment.

68.     Defendants are in possession and control, and know the whereabouts, of all Vehicles.

69.     Defendants do not have an equitable right to keep the Vehicles or the business revenues generated from the taxi vehicles.

70.     Defendants should be ordered to turn over the Vehicles to the Debtors as authorized by Section 542.

## COUNT III
### (Imposition of Constrictive Trust)

71.    Debtors repeat each and every allegation aforementioned as if set forth at length herein.

72.    Debtors and the Medallion Defendants held and maintained a confidential and/or fiduciary relationship.

73.    Among other things, the Principals of the Medallion Defendant, Mamed and Vladimir are members of the two LLC Debtors, Downtown and Tunnel.

74.    Although there is no written agreement between the Medallion Defendants and the Debtors, the Medallion Defendants agreed that they would hold legal title to certain Vehicles at issue as constructive trustees whereas the actual beneficial title to the Vehicles, including all obligations to purchase, maintain, insure, repair and operate the Vehicles would lie with the Debtors.

75.    As evidence of the Debtors' ownership of the vehicles, each and every vehicle title was held by the Debtors, at the Debtors' premises, even though a number of these titles were nominally in the names of the Medallion Defendants.

76.    In reliance upon the Medallion Defendants' promises and representations as aforesaid, the Debtors incurred all of the expenses of purchasing, insuring, repairing, and maintaining the Vehicles.

77.    The Medallion Defendants abided by this arrangement until recently, when they unlawfully removed Vehicles from the Debtors' possession, custody and control, and further convinced CMT to re-route the associated revenue streams to themselves; and, to add insult to

injury, the Medallion Defendants converted Vehicles (and associated revenue streams) in which the Medallion Defendants did not, and never did, even hold a nominal legal interest.[3]

78.    In so doing, the Medallion Defendants are using the Vehicles for their own self-interested business purposes, namely, to generate revenue for themselves, while blatantly depriving Debtors of their ability to generate revenue even though Debtors are the beneficial owners of the Vehicles.

79.    The Medallion Defendants are being unjustly enriched by earning substantial amounts of revenue by utilizing the Debtors' vehicles.  The revenues the Medallion Defendants are generating rightfully belong to the Debtors.

80.    It would be inequitable to permit the Medallion Defendants to continue utilizing the Vehicles in which Debtors have the sole beneficial interest.

81.    By reason of the foregoing, a constructive trust should be imposed over (a) all of the Vehicles in the Medallion Defendants' and/or the Individual Defendants' possession, as identified in Exhibit A herein, and (b) all revenues that have been, and are continuing to be, generated by the Medallion Defendants through the use of Debtors' Vehicles.

## COUNT IV
### (Conversion)

82.    Debtors repeat each and every allegation aforementioned as if set forth at length herein.

83.    As beneficial owners, Debtors had, and continue to have, a right of possession in the Vehicles identified in Exhibit A herein.

---

[3] As just one example, eight of the vehicles that were taken and had their revenue streams co-opted were at all times nominally titled not in the Medallion Defendants names, but in the name of Gene Freidman.

84.    The Medallion Defendants have never held a valid possessory interest in the Vehicles, as at best, they held bare legal title at some point in time.

85.    The Medallion Defendants nonetheless have diverted the Vehicles from the Debtors, without any authorization to do so and/or under false pretenses; and, are currently wrongfully exercising dominion and control over such vehicles to the exclusion of Debtors' rights.

86.    The Medallion Defendants have diverted substantial revenues from the Debtors, without any authorization to do so and/or under false pretenses; and, are continuing to use the Debtors' property (*i.e*., the taxi cab vehicles) to generate business revenues for themselves. The Medallion Defendants have unlawfully hijacked the Debtors' operations and have converted, and are continuing to convert, hundreds of thousands of dollars of monthly revenues that rightfully belong to Debtors.

87.    As a result of the foregoing, the Medallion Defendants have knowingly and intentionally converted Debtors' property for their ultimate benefit, resulting in actual and substantial injury to the Debtors and their businesses.

88.    By reason of the foregoing, the Debtors are entitled to a judgment against the Medallion Defendants in excess of two millions dollars, plus interest and costs.

## COUNT V
(Breach of Trust)

89.    Debtors repeat each and every allegation aforementioned as if set forth at length herein.

90.    The Medallion Defendants, Individual Defendants and Debtors agreed that where legal title to vehicles at issue was placed in the names of the Medallion Defendants' entities, the Medallion Defendants would hold such title in trust, for the benefit and protection of the Debtors

and/or others who were actually operating the vehicles and paying all associated vehicle expenses.

91.    To the extent the Medallion Defendants held legal title to vehicles at issue, they were nothing more than constructive trustees, and had a duty to protect Debtors' beneficial interests in those vehicles.

92.    The Medallion Defendants and Individual Defendants have violated this agreement by unlawfully diverting the Vehicles from the Debtors, for their own use, and depriving Debtors of their rights and beneficial interest in that property.

93.    By reason of the foregoing, the Debtors are entitled to a judgment against the Medallion Defendants in excess of two millions dollars, plus interest and costs.

## COUNT VI
(Declaratory Judgment)

94.    Debtors repeat each and every allegation aforementioned as if set forth at length herein.

95.    There is a legal and justiciable controversy between the Medallion Defendants and the Debtors concerning the ownership and possessory rights of the Vehicles.

96.    The Debtors are entitled to a declaratory judgement that the Vehicles are all beneficially owned by the Debtors; that the Medallion Defendants have no possessory rights to any of the Vehicles; and, that at most, the Medallion Defendants were constructive trustees of some vehicles, which they were required to hold in trust for the benefit of the Debtors.

## COUNT VII
(Tortious Interference with Economic Advantage)

97.    Debtors repeat each and every allegation aforementioned as if set forth at length herein.

98.    Debtors had a business relationship with CMT under which CMT had provided, and was going to continue providing, critical financial and technology services to the Debtors for the operation of their businesses.    This included services for payment processing, and management of financial transactions.

99.    The Medallion Defendants were fully aware of this business relationship between Debtors and CMT.

100.    Upon information and belief, the Medallion Defendants contacted CMT and directed it to discontinue its services to Debtors; misrepresented that Debtors no longer had any legal interest in the Vehicles and revenues being generated, and that those interests now belonged to the Medallion Defendants; and instructed CMT to shift the services it was providing over to the Medallion Defendants.  The Medallion Defendants were not authorized to take such action on Debtors' behalf, but did so anyway for the sole purpose of intentionally interfering with and injuring Debtors' businesses, and business relationship with CMT.

101.    Upon information and belief, the Medallion Defendants engaged in this wrongful and malicious conduct as a form of payback, or retribution, because the Debtors had stopped paying the Medallion Defendants' debt service obligations, for which the Medallion Defendants were contractually responsible.

102.    By reason of the foregoing, the Debtors are entitled to a judgment against the Medallion Defendants in excess of two millions dollars, plus interest and costs.

## COUNT VIII
(Replevin)

103.    Debtors repeat each and every allegation aforementioned as if set forth at length herein.

104.     Debtors have a possessory interest and right to use and operate the Vehicles that are the subject of this lawsuit, which are unique and critical to the Debtors' businesses.

105.     The Medallion Defendants have diverted, and continue to unlawfully possess, the Vehicles, and are using many of the Vehicles for the purpose of generating revenue and benefitting their businesses.

106.     The Debtors' right to possess and use the Vehicles is superior to that of the Medallion Defendants.  Debtors have demanded the return of the vehicles, but the Medallion Defendants  have refused to do so.

107.     Debtors are entitled to immediate exclusive possession of the Vehicles.

108.     By reason of the foregoing, Debtors are entitled to an order, as authorized by Section 542, requiring the Medallion Defendants to immediately return (or turnover) the subject vehicles to the Debtors.

## COUNT IX
(Breach of Contract/Breach of Fiduciary Duty as
against the Individual Defendants Mamed and Vladimir only)

109.     Debtors repeat each and every allegation aforementioned as if set forth at length herein.

110.     Two of the Debtors, Tunnel and Downtown, are limited liability companies.   As stated in the Tunnel Membership Agreement, which both Vladimir and Mamed signed:  Section 6.5(a) "A Member shall be entitled to enter into transactions that may be considered to be competitive with the Company, it being expressly understood that Members may enter into transactions that are similar to the transactions into which the Company may enter.  Notwithstanding the foregoing, Members shall account to the Company, and hold as trustee for it any Property, Profit, or benefit derived by the member, without the consent of all the other

Members, in the conduct and the winding up of the Company business or from a use or appropriation by the Member of Company Property including information developed exclusively for the Company and Opportunities expressly offered to the Company."

111.    In diverting Vehicles and the associated revenue stream to the Medallion Defendants, Vladimir and Mamed individually breached their fiduciary duties to Debtors Tunnel and Downtown and also breached the terms of the Operating Agreements of Tunnel and Downtown.

112.    By reason of the foregoing, the Debtors are entitled to a judgment against defendants Mamed and Vladimir in excess of two millions dollars, plus interest and costs, and the injunctive relief as set forth above in Count I.

## **COUNT X**
(Aiding and Abetting Breach of Fiduciary Duty against all Individual Defendants)

113.    Debtors repeat each and every allegation aforementioned as if set forth at length herein.

114.    The Individual Defendants, including Mamed, Vladimir, Boris, Mikhail, Makism, Veronika, and Galina, actively, knowingly, and substantially participated in, assisted, facilitated, and/or conspired with the Medallions Defendants, in perpetrating the unlawful diversion of the Debtors' assets, namely the Vehicles and revenue streams associated with the Vehicles, from the Debtors' rightful possession and control, to the Medallion Defendants.

115.    As such, the Individual Defendants have unlawfully aided and abetted the Medallion Defendants in tortious activity.

116.    By reason of the foregoing, the Debtors are entitled to a judgment against the individual defendants in excess of two millions dollars, plus interest and costs.

## COUNT XI
### (Breach of Contract as against CMT)

117.   Debtors repeat each and every allegation aforementioned as if set forth at length herein.

118.   The Debtors and CMT had an agreement under which, for consideration, CMT would provide its various technology solutions, including payment processing technology and services, to the Debtors in connection with the operation of Debtors' numerous vehicles, including those identified in Exhibit A herein.

119.   As detailed above, CMT improperly halted providing its services to the Debtors for the Vehicles at issue, based upon the misrepresentations from the Medallion Defendants and individual defendants; and, in so doing, CMT never contacted the Debtors and confirmed that it should terminate its services to the Debtors, and/or that payments in connection with the Vehicles should be diverted to different bank accounts.

120.   CMT's aforementioned conduct constituted a breach of the parties' agreement.

121.   By reason of the foregoing, the Debtors are entitled to a judgment against CMT in excess of $500,000.00, plus interest and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, the Debtors pray for judgment against Defendants as follows:

(1)   The injunctive relief as set forth in Count I;

(2)   The turnover of vehicles, and replevin, as set forth in Counts II and VIII;

(3)   Imposition of a Constructive Trust, as set forth in Count III;

(4)   An award of money damages, as set forth in Counts IV, V, VII, IX, X, and XI;

(5)   Declaratory Judgment, as set forth in Count VI, and

(6)   such other and further relief as the Court deems just and proper.

Dated: New York, New York
      November 6, 2017

**PORZIO, BROMBERG & NEWMAN, P.C**.

By:    */s/ Brett S. Moore*
        Brett S. Moore
        Warren J. Martin Jr.
        Gary M. Fellner
        156 West 56th Street, Ste 803
        New York, NY 10019-3800
        Tel (212) 265-68881
        Fax (212) 957-3983
        bsmoore@pbnlaw.com
        wjmartin@pbnlaw.com
        gmfellner@pbnlaw.com

*Attorneys for Debtors Woodside Management Inc., Tunnel Taxi Management LLC, Downtown Taxi Management LLC, and 28th Street Management Inc.*

## VERIFICATION

I, EVGENY A. FREIDMAN, of full age, declare and certify as follows:

    1.      I have read the foregoing Verified Adversary Complaint and know the contents

thereof.

    2.      The same is true to my own knowledge, except as to the matters stated to be

alleged on information and belief, and as to those matters I believe them to be true.


      I hereby declare under the laws of the United States that the foregoing statements made
by me are true to the best of my knowledge.


               */s/ Evgeny A. Freidman*
               **EVGENY A. FREIDMAN**


Dated:  November 6, 2017